Jennifer L. Loda (CA Bar No. 284889)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612-1810
Phone: (510) 844-7136
Fax: (510) 844-7150
jloda@biologicaldiversity.org

Collette L. Adkins (MN Bar No. 035059X)*
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
Phone: (651) 955-3821
cadkins@biologicaldiversity.org

Attorneys for Plaintiffs

*Seeking admission *pro hac vice*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**; **WESTERN WATERSHEDS PROJECT**; **ANIMAL LEGAL DEFENSE FUND**; **PROJECT COYOTE/EARTH ISLAND INSTITUTE**; **ANIMAL WELFARE INSTITUTE**; **WILDEARTH GUARDIANS**;<br><br>Plaintiffs,<br><br>v.<br><br>**USDA APHIS WILDLIFE SERVICES**; **WILLIAM H. CLAY**, Deputy Administrator, USDA APHIS Wildlife Services;<br><br>Defendants. | Case No._____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiffs Center for Biological Diversity, Western Watersheds Project, Animal Legal Defense Fund, Project Coyote/Earth Island Institute, Animal Welfare Institute and WildEarth Guardians bring this lawsuit against defendants U.S. Department of Agriculture

Complaint for Declaratory and Injunctive Relief                                                                                       1

("USDA") Animal and Plant Health Inspection Service ("APHIS") Wildlife Services and William H. Clay, the program's Deputy Administrator (hereinafter collectively "Wildlife Services"). By continuing to kill predators and other wildlife without supplementing the outdated NEPA analysis for the "Wildlife Damage Management" program in California's North District, Defendants are failing to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, and the implementing Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. §§ 1500-1508, as well as the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

2. NEPA requires supplemental analysis when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. 40 C.F.R. § 1502.9(c)(1)(ii). Approximately 20 years have passed since Wildlife Services analyzed the impacts of its "Wildlife Damage Management" program in the North District in a finalized NEPA document. New information and circumstances relevant to the predator-killing program, such as new scientific publications on the ineffectiveness of predator control, require that Wildlife Service prepare a supplemental NEPA analysis.

3. Through this Complaint, Plaintiffs seek a declaration that Wildlife Services' ongoing authorization and implementation of the Wildlife Damage Management program in California's North District violates federal law and is otherwise arbitrary and capricious. Plaintiffs additionally seek injunctive relief to redress the injuries caused by these violations of the law. Should Plaintiffs prevail, they will seek an award of costs, attorneys' fees, and other expenses pursuant to the Equal Access to Justice Act, 22 U.S.C. § 2412.

## JURISDICTION

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706(2).

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the agency's violations of law occurred and continue to occur in this district, and injury to Plaintiffs and their members occurred and continues to occur in this district.

Moreover, plaintiffs Center for Biological Diversity, Western Watersheds Project, Animal Legal Defense Fund, and Project Coyote/Earth Island Institute maintain offices in this district.

### INTRADISTRICT ASSIGNMENT

6. Pursuant to Civil Local Rules 3-2(c) and 3-2(f), the appropriate intradistrict assignment of this case is the Eureka Division because a substantial part of the agency's violations of law occurred and continue to occur in the counties of Del Norte, Humboldt, and Mendocino, which are within the management area of Wildlife Services' California North District, where implementation of the Wildlife Damage Management program occurs.

### PARTIES

7. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit 501(c)(3) organization with about 58,000 active members, with offices in Oakland, California, and elsewhere across the country. The Center for Biological Diversity works through science, law, and media to protect rare wildlife, including predators targeted by Wildlife Services.

8. Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a non-profit corporation with over 5,000 members and supporters, and field offices in several western states including in Martinez, California. WWP is dedicated to protecting and restoring watersheds and wildlife in the American West through education, public policy initiatives, and legal advocacy. WWP and its members have longstanding interests in improving public lands management and tracking federal management of wildlife and predators throughout the Western United States.

9. Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a non-profit 501(c)(3) organization with more than 200,000 members and supporters headquartered in Cotati, California. ALDF works to advance the interests of animals, including wildlife, through the legal system. ALDF and its members derive scientific, recreational, conservational, and aesthetic benefits from Wildlife Services' procedural compliance with NEPA and the existence of the diverse wildlife native to California's Northern District.

10. Plaintiff PROJECT COYOTE/EARTH ISLAND INSTITUTE includes Project Coyote, which is a fiscally sponsored project of the national non-profit organization Earth Island Institute based in Northern California. Project Coyote is a coalition of wildlife scientists,

1  educators, ranchers and community leaders that promotes compassionate conservation and
2  coexistence between people and wildlife through education, science and advocacy. Project
3  Coyote is dedicated to changing negative attitudes toward coyotes, wolves and other native
4  carnivores by replacing ignorance and fear with understanding, respect and appreciation.

5        11.     Plaintiff ANIMAL WELFARE INSTITUTE ("AWI") is a national, non-profit
6  charitable organization headquartered in Washington D.C. and founded in 1951 to reduce the
7  sum total of pain and fear inflicted on non-human animals by people. AWI and its members
8  derive scientific, recreation, conservation, and aesthetic benefits from the existence of the diverse
9  wildlife native to California. AWI is dedicated to minimizing the impacts of human actions
10 detrimental to endangered or threatened species, including harassment, habitat degradation,
11 encroachment and destruction, and irresponsible hunting and trapping practices.

12       12.     Plaintiff WILDEARTH GUARDIANS is a non-profit 501(c)(3) organization with
13 over 207,000 members and supporters, headquartered in Santa Fe, New Mexico with offices
14 across the West. Many of these members and supporters reside in and/or recreate in Northern
15 California. Guardians and its members are dedicated to protecting and restoring the wildlife, wild
16 places, wild rivers, and health of the American West.

17       13.     Plaintiffs, as well as their members, staff, and supporters, are dedicated to
18 ensuring that Defendants comply with all applicable federal laws. Wildlife Services' Wildlife
19 Damage Management program, along with its associated 1997 EA and Finding Of No
20 Significant Impact ("1997 EA/FONSI"), adversely impact Plaintiffs' interests in California's
21 wildlife that could be killed by Wildlife Services—intentionally or unintentionally—including
22 gray wolves, coyotes, black bears, mountain lions, bobcats, foxes, fishers, and others. Plaintiffs
23 also have members who are adversely impacted by the threat that Wildlife Services poses to
24 companion animals in the North District.

25       14.     Plaintiffs' members, staff, and supporters live and recreate in or near areas within
26 the management area of Wildlife Services' California North District, where implementation of
27 the Wildlife Damage Management program occurs, for the purposes of hiking, observing
28 wildlife, and other recreational and professional pursuits. Plaintiffs' members and staff enjoy

observing, attempting to observe, photographing, and studying wildlife, including signs of those species' presence in these areas. The opportunity to possibly view wildlife or their signs in these areas is of significant interest and value to Plaintiffs' members and staff, and increases the use and enjoyment of public lands and ecosystems in northern California. Plaintiffs' members, staff, and supporters have engaged in these activities in the past, and they intend to do so again in the near future.

15. Plaintiffs' members, staff, and supporters have a procedural interest in ensuring that all Wildlife Services' activities comply with all applicable federal statutes and regulations. Plaintiffs have worked to reform Wildlife Services' activities throughout the United States, including in California. Plaintiffs and their members, staff, and supporters have an interest in preventing Wildlife Services from being involved in lethal wildlife damage management, particularly predator control, and in the use of more effective and proactive non-lethal alternatives that foster communities' coexistence with wildlife. The relief requested in this litigation would further that goal.

16. The interests of Plaintiffs' members, staff, and supporters have been, and will continue to be, injured by Wildlife Services' wildlife-killing activities in California and its failure to comply with NEPA in implementing its Wildlife Damage Management program in California's North District.

17. The relief requested by Plaintiffs in this complaint would redress the injuries of Plaintiffs' members, staff, and supporters. The relief requested by Plaintiffs, if granted, would prevent Wildlife Services from engaging in wildlife damage management activities until, and unless, it complies with federal law. The relief requested by Plaintiffs, if granted, could reduce the amount of lethal predator control and other wildlife killing conducted in California. The relief requested by Plaintiffs, if granted, would make wildlife killing more expensive for the California Department of Fish and Wildlife ("CDFW"), local municipalities, and private livestock producers because these entities would not be able to contract with Wildlife Services to conduct lethal wildlife damage management activities on their behalf. These entities cannot and would not be able to completely replace Wildlife Services' activities authorized by the 1997

EA/FONSI, and they would not be able to provide the services contemplated by the 1997 EA/FONSI at the same cost as if Wildlife Services provided those same services. These entities do not have the equipment, such as fixed-wing aircraft for aerial gunning operations, and trained wildlife killing personnel that Wildlife Services has.

18. Plaintiffs' interests, and those of their members and supporters, have been, are being, and, unless the requested relief is granted, will continue to be harmed by Defendants' actions and inactions challenged in this complaint. If this Court issues the relief requested, the harm to Plaintiffs' interests, and of the harm to their members and supporters' interests, will be redressed.

19. Defendant USDA APHIS WILDLIFE SERVICES is a division of the United States Department of Agriculture's ("USDA") Animal and Plant Health Inspection Service ("APHIS"). Wildlife Services is a federal agency that is responsible for applying and implementing the federal laws and regulations challenged in this complaint. Wildlife Services receives federal and cooperator funding to undertake wildlife damage management activities in California.

20. Defendant WILLIAM H. CLAY is being sued in his official capacity as the Deputy Administrator of USDA APHIS Wildlife Services.

## LEGAL BACKGROUND

**National Environmental Policy Act**

21. Under the National Environmental Policy Act ("NEPA"), a federal agency must prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(C). Human environment "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14.

22. To determine whether an action is significant—i.e., whether an EIS is necessary for the proposed action—the Council for Environmental Quality ("CEQ") regulations require an agency first to prepare an EA. *Id.* § 1501.4(b). Significance determinations are governed by CEQ regulations, which require agencies to consider both the context of the action and the intensity of

the environmental impacts. *Id.* § 1508.27. If the agency determines that a full EIS is not necessary, the agency must prepare a finding of no significant impact ("FONSI"). A FONSI is a "document . . . briefly presenting the reasons why [the proposed] action . . . will not have a significant effect on the human environment . . . ." *Id.* § 1508.13.

23. "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.* § 1500.1(c). The CEQ "regulations provide the direction to achieve this purpose." *Id*. To that end, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

24. The environmental analysis must disclose and analyze the direct, indirect, and cumulative effects of the proposed action on the environment. *Id.* §§ 1502.16 (discussion of environmental consequences), 1508.7 (cumulative impacts), 1508.8 (direct and indirect effects), 1508.25(c)(3) (scope of impacts that must be considered).

25. An agency has a continuing obligation to comply with NEPA and must prepare a supplemental NEPA document when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. *Id.* § 1502.9(c)(1)(ii); *see Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010).

**Administrative Procedure Act**

26. NEPA does not contain an internal standard of review, so judicial review is therefore governed by the APA. Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

27. In addition, APA section 706(1) authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

**FACTUAL BACKGROUND**

**I.   Wildlife Services' Wildlife Killing Program**

28.   Wildlife Services and its precursors have specialized in killing wildlife for more than 100 years, and are responsible for the eradication of wildlife like wolves, bears, and other animals from much of the United States, particularly in the West. Wildlife Services contracts with other federal agencies, non-federal government agencies, and private landowners to fulfill its mission of "managing problems caused by wildlife."

29.   At present, Wildlife Services kills millions of animals every year. In Fiscal Year 2016, Wildlife Services reports that it killed more than 2.7 million animals across the United States, including 415 gray wolves; 76,963 adult coyotes, plus an unknown number of coyote pups in 430 destroyed dens; 407 black bears; 334 mountain lions; 997 bobcats; 535 river otters, including 415 killed "unintentionally;" 3,791 foxes, plus an unknown number of fox pups in 128 dens; and 21,184 beavers. The program also killed 14,654 prairie dogs outright, as well as an unknown number killed in more than 68,000 burrows that were destroyed or fumigated.

30.   Each year Wildlife Services unintentionally kills thousands of animals of non-target species. These non-target species include federally or state protected animals such as gray wolves, California condors, bobcats, and grizzly bears, as well as eagles, falcons, red-tailed hawks, great horned owls, porcupines, marmots, great blue herons, ruddy ducks, sandhill cranes, and ringtail cats. These killings undermine efforts to conserve and recover the affected species, which oftentimes need protection in part due to Wildlife Services' historic and ongoing practices.

31.   Former employees have alleged that Wildlife Services underreports the numbers of animals killed by the agency, and therefore, that the actual numbers of animals killed are likely greater than reported.

32.   Many of the species Wildlife Services targets play critical roles in ecosystems, and their removals result in a cascade of unintended consequences. The loss of top predators in particular is well documented to cause a wide range of unanticipated impacts that are often profound, altering processes as diverse as the dynamics of disease, wildfire, carbon sequestration, invasive species, and biogeochemical cycles. In short, the removal of so many

animals from the environment—especially predators—significantly alters native ecosystems directly, indirectly, and cumulatively.

33. Many of the methods Wildlife Services uses—including leg-hold and body-gripping traps, snares, and gas cartridges—are fundamentally nonselective, environmentally destructive, inherently cruel, and often ineffective.

34. For example, leg-hold traps are internationally recognized as inhumane and have been banned in many countries. Upon being trapped, animals frantically struggle to free themselves both by attempting to pull their trapped limb out of the device and by chewing at the trap itself or even their own limbs. The force of the jaws clamping on the animal's limb and the subsequent struggle result in severe trauma, including mangling of the limb; fractures; damage to muscles and tendons; lacerations; injury to the face and mouth; broken teeth; loss of circulation; frostbite; and amputation. Wildlife Services often fails to routinely check its traps, and as such, many animals experience prolonged suffering and may eventually die of exposure.

35. In California's North District, the 1997 EA/FONSI authorizes Wildlife Services' involvement in Wildlife Damage Management. Specifically, it authorizes use of leg-hold traps, aerial gunning (shooting fleeing animals from airplanes or helicopters), M-44s (sodium cyanide bombs), firearms, neck snares, Livestock Protection Collars, gas cartridges (for killing animals in dens), and more.

36. Target species include coyote, red fox, mountain lion, black bear, bobcat, gray fox, and dog. Wildlife Services has also unintentionally trapped and sometimes killed several non-target animals in California's North District, including badger, gray fox, jackrabbit, muskrat, raccoon, opossum, and skunk.

37. Wildlife Services' North District currently includes 13 California counties: Butte, Humboldt, Lassen, Mendocino, Modoc, Nevada, Plumas, Sierra, Shasta, Siskiyou, Sutter, Trinity and Yuba counties.

II. **NEPA Analysis of Wildlife Damage Management in California's North District**

38. The agency in 1994 prepared (and in 1997 amended) a Programmatic EIS ("1994 PEIS") to analyze its nationwide wildlife damage control program. That outdated document

relies mostly on science from the 1980s, with some studies from as far back as the 1930s. On October 12, 2016, Wildlife Services announced that it intends to redo or revise all of the NEPA documents currently tiered to the 1994 PEIS.

39. Wildlife Services has never prepared an EIS analyzing the impacts of its "Wildlife Damage Management" program in California's North District.

40. In 1997, Wildlife Services issued an EA and FONSI for "Wildlife Damage Management" in California's North District. The 1997 EA/FONSI explains that its analysis "relies heavily on existing data contained in published documents, primarily the USDA-APHIS-ADC Environmental Impact Statement (ADC EIS) (USDA 1994) to which this Environmental Assessment (EA) is tiered . . . ."

41. In May 2015, Wildlife Services released a pre-decisional Environmental Assessment for its "Mammal Damage Management" program for California's North District. On July 15, 2015, Plaintiffs submitted written comments on the pre-decisional EA.

42. More than 18 months after Wildlife Services released the pre-decisional EA, on January 19, 2017, Plaintiffs sent a written request that Wildlife Services promptly finalize the EA and begin preparation of an EIS given the potential for significant impacts.

43. On January 24, 2017, Wildlife Services responded to Plaintiffs' letter explaining that it would complete its final decision "within the next several months."

44. As of the date of this Complaint, however, Wildlife Services still has not supplemented its analysis in the 1997 EA/FONSI or finalized the 2015 pre-decisional Environmental Assessment.

**III. New Information and Circumstances Affecting Wildlife Damage Management in California's North District**

45. Since Wildlife Services prepared its 1997 EA/FONSI, new information and circumstances demonstrate that supplemental NEPA analysis is required.

46. The number of animals killed by Wildlife Services in the North District has changed, as well as the species targeted. The 1997 EA/FONSI reports the following annual averages of animals Wildlife Services killed from 1994-1995: 3,060 coyotes, 14 bobcats, and 46

gray foxes. In addition, in 1994 and 1995, Wildlife Services killed three red foxes, 100 mountain lions, 67 black bears and six dogs. The 2015 pre-decisional EA explains that the annual average from 2010-2013 was 1605 coyotes, 12 bobcats, 895 skunks, and 35 foxes. In addition, Wildlife Services kills many other species within the North District, including birds, which have not benefited from any NEPA analysis.

47. The methods Wildlife Services uses have changed since 1997. For example, the 1997 EA/FONSI authorizes use of Livestock Protection Collars, which Wildlife Services no longer uses in California.

48. Additional species listed as threatened or endangered and additional species of special concern have been identified in California's North District since the 1997 EA/FONSI. These include: California tiger salamander, Sierra Nevada yellow-legged frog, gray wolf, Canada lynx, Oregon spotted frog, wolverine (proposed federally threatened), and Sierra Nevada red fox (candidate). All of these may be affected by the Wildlife Damage Management program, but none were analyzed in the 1997 EA/FONSI. As one specific example, the endangered gray wolf returned to California in 2015, but the 1997 EA/FONSI did not analyze impacts on gray wolf and includes no mitigation measures to prevent harm to the species.

49. Since 1997, the Environmental Protection Agency has issued new restrictions to protect endangered species, such as gray wolves, that could be harmed by Wildlife Services' use of gas cartridges to kill denning animals.

50. In the last decade, several M-44s that Wildlife Services placed have poisoned people, non-target wildlife, and family dogs. A supplemental NEPA analysis should analyze whether Wildlife Services should continue to use these dangerous devices in California.

51. Since the 1997 EA/FONSI, numerous studies have been published that demonstrate the harmful ecological effects of removing predators from ecosystems (e.g., Beschta & Ripple 2009, 2016; Levi et al. 2012; Bergstrom et al. 2013; Bergstrom 2017).

52. Numerous studies published after the 1997 EA/FONSI call into question Wildlife Services' assumption that killing predators effectively protects commercial livestock over the long term. For example, Wielgus and Peebles (2014) found that killing predators to protect

livestock can backfire and may actually *increase* livestock depredation. In addition, Treves and others (2016) found little or no scientific support for the proposition that killing predators such as wolves, mountain lions, and bears to protect livestock actually reduces livestock losses.

53. In addition, new information regarding the cost-effectiveness of predator control has emerged since the 1990s. For example, Rashford and Grant (2010) published a literature review of economic analyses of predator control.

54. New information raising ethical concerns about practices of some Wildlife Services staff has also emerged since 1997. For example, in 2012, the *Sacramento Bee* published a series of articles exposing a number of the practices of Wildlife Services. This series described ethical problems within the agency, including employees hiding killings of non-target animals. The *Sacramento Bee* reported that a Wildlife Services employee posted photographs online of his dogs attacking coyotes caught in leg-hold traps and was not disciplined.

55. Since 1997, a variety of nonlethal, alternative methods have been successfully used to prevent wildlife conflicts, and numerous studies have demonstrated the effectiveness of such nonlethal methods to protect livestock from predators (e.g. Shivik et al. 2003; Lance et al. 2010).

56. Marin County, California, provides a strong illustration of the advantages and effectiveness associated with nonlethal predator control. In 2000, Marin redirected funds from lethal management toward nonlethal measures. Funds were allocated for the provision of tools such as livestock guard animals (dogs and llamas); night corrals; fencing; lamb sheds; noise- and light-generating devices; and compensation to farmers for livestock losses. These measures proved less expensive and more effective than lethal control; average annual losses declined from five percent to 2.2 percent. Marin's experience demonstrates that nonlethal wildlife management tools are both effective and affordable, and the feasibility of nonlethal methods requires supplemental NEPA analysis.

57. The 1997 EA/FONSI authorizes use of traps and snares to take bobcat even though California law now prohibits the trapping of bobcat. 14 C.C.R. § 478(c) ("It shall be

unlawful to trap any bobcat, or attempt to do so, or to sell or export any bobcat or part of any bobcat taken in the State of California.").

58. The 1997 EA/FONSI does not restrict the methods for killing mountain lion even though California law now prohibits the poisoning, snaring, and trapping of mountain lions. 14 C.C.R. § 402(b) ("Permittee may take mountain lion in the manner specified in the permit, except that no mountain lion shall be taken by means of poison, leg-hold or metal-jawed traps and snares.").

59. Moreover, Proposition 4, passed in 1998, bans the following methods of capturing or killing wildlife: body-gripping traps, such as leg-hold traps, conibear traps and snares for commercial and recreational purposes; leg-hold traps for all purposes (except by authorized agencies to protect public human health and safety); Compound 1080; and M-44 sodium cyanide.

60. The counties included in California's North District have changed since 1997 and that means that the environmental baseline is now different. For example, Wildlife Services no longer operates in Glenn County, California, as it did in 1997.

61. More than 20 years have passed since preparation of the 1997 EA/FONSI and 1994 PEIS. For all the reasons explained above, those analyses are now outdated and can no longer be reasonably relied upon without supplemental NEPA analysis.

## CLAIM FOR RELIEF

**NEPA and APA Violation: Failure to Supplement 1997 EA/FONSI**

1. Plaintiffs re-allege and incorporate by reference the preceding paragraphs into the claim set forth below.

2. NEPA requires an action agency to prepare an EIS when a proposed major federal action may significantly affect the quality of the environment. 42 U.S.C. § 4332(C). An agency has a continuing obligation to comply with NEPA and must prepare a supplemental NEPA document when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. 40 C.F.R. § 1502.9(c)(1)(ii).

3. Here, more than two decades have passed since Wildlife Services completed its 1994 PEIS and its 1997 EA/FONSI. That analysis is now outdated and can no longer be reasonably relied upon without supplemental analysis.

4. Indeed, significant new circumstances and information relevant to environmental concerns and bearing on APHIS-Wildlife Services' wildlife damage management activities in California's North District and their impacts have since emerged. For example, recent studies demonstrate the harmful effects of removing predators from ecosystems, and additional animals have been protected under the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA") and require analysis.

5. Wildlife Services' failure or refusal to supplement its NEPA analysis and its failure to halt or limit its ongoing activities while completing new analyses, as required by NEPA, is arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitutes agency action unlawfully withheld or unreasonably delayed under Section 706 of the APA, which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests. 5 U.S.C. § 706.

## REQUEST FOR RELIEF

WHEREFORE, the Center requests that the Court:

(1) Declare that Wildlife Services has violated and is violating NEPA, 42 U.S.C. §§ 4321-4347, and the implementing CEQ regulations, 40 C.F.R. §§ 1500-1508, by failing to supplement its outdated NEPA analysis governing its wildlife damage management activities in California's North District;

(2) Declare that Wildlife Services' failure or refusal to supplement its outdated NEPA analysis and its failure to halt or limit its ongoing activities while completing the new analysis, as required by NEPA, is arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitutes agency action unlawfully withheld or unreasonably delayed under Section 706 of the APA;

(3) Order Wildlife Services to complete the required supplemental NEPA analysis;

1     (4)    Enjoin Wildlife Services and their agents from proceeding with implementing the challenged Wildlife Damage Management Program unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

    (5)    Award Plaintiffs' their attorneys' fees and costs in this action pursuant to 28 U.S.C. § 2412; and

    (6)    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted and dated this 21st day of June, 2017.

    /s/ Jennifer L. Loda

Jennifer L. Loda (CA Bar No. 284889)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612-1810
Phone: (510) 844-7136
Fax: (510) 844-7150
jloda@biologicaldiversity.org

Collette L. Adkins (MN Bar No. 035059X)*
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
Phone: (651) 955-3821
cadkins@biologicaldiversity.org

Attorneys for Plaintiffs
*Seeking admission *pro hac vice*